IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WEAVER BROS. INSURANCE
ASSOCIATES, INC.,

          Plaintiff,

   v.

JACQUELINE BRAUNSTEIN, et al.,

          Defendants.

CIVIL ACTION
NO. 11-5407

**OPINION**

**Slomsky, J.**                                                    **June 9, 2014**

TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   SPECIAL FINDINGS OF FACT PURSUANT TO FED. R. CIV. P. 52(a)(1) ..................... 6

     A.   Summary Plan Description ...................................................................... 6

     B.   Terms of the Life Insurance Plan ............................................................. 7

     C.   Plan Administrators................................................................................ 10

     D.   Material Misrepresentations Made By the Plan Administrator................................ 12

III.  CONCLUSIONS OF LAW....................................................................................... 19

     A.   Weaver Bros. is a Fiduciary under ERISA ............................................................. 19

     B.   Weaver Bros. Breached Its Fiduciary Duty to Deborah Braunstein by
         Providing an Inadequate Summary Plan Description and by Making Material
         Misrepresentations to Her about the Life Insurance Plan........................................ 21

         1.   Weaver Bros. Provided An Inadequate Summary Plan Description ..……... 21

             a.   The Certificate Of Insurance Is Not Part of The Summary Plan
                Description……....…………………………………………………… 24

       b.    The Certificate Of Insurance Does Not Clearly And Simply
             Describe The Life Insurance Conversion Right………………………… 26

    2.   Weaver Bros., as a Fiduciary, Made Material Misrepresentations
       to Deborah Braunstein……………….…………………………………..... 29

       a.    Weaver Bros. Was Under an Affirmative Duty to Disclose the Life
             Insurance Conversion Right………...…………………….…………… 32

       b.    Evidence of Intentional Deception is Not Required to Establish a
             Breach of Fiduciary Duty Claim Based on a Plan Administrator's
             Material Misrepresentations……..…………………………………………37

       c.    A Writing is Not Required to Establish a Breach of Fiduciary Duty
             Claim Based on a Plan Administrator's Material Misrepresentations…38

  C.   Braunstein Beneficiaries May Seek "Appropriate Equitable Relief" Under
      29 U.S.C. § 1132(a)(3)(B) ...................................................................................... 40

  D.   Braunstein Beneficiaries Are Entitled To Relief In Their Individual Capacities..... 42

IV.   CONCLUSION.......................................................................................................... 43

## I.   INTRODUCTION

The Employee Retirement Income Security Act ("ERISA") was enacted to protect participants who enroll in employee health and pension plans.  Under ERISA, "Plan Administrators" are deemed fiduciaries, and are required to disclose to plan participants "financial and other information" about the plans.  29 U.S.C. § 1001(b).  To this end, ERISA requires Plan Administrators to provide plan participants with a summary of the rights and benefits offered under each plan.  This summary is known as the summary plan description ("SPD").  Additionally, Plan Administrators have a fiduciary duty not to affirmatively misrepresent the terms of a plan to plan participants.  Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 135 (3d Cir. 1993).

Here, Deborah Braunstein, a "plan participant," was covered by a life insurance plan[1] ("Life Insurance Plan" or "Plan") provided as a benefit by her employer, Weaver Bros. Insurance Associates, Inc. ("Weaver Bros.").  The Plan provided that upon Braunstein's death, a sum of money would be paid to her designated beneficiaries.  Under the Plan, Weaver Bros. was the Plan Administrator, while Fortis Benefits Insurance Company ("Fortis") was the "Claims Administrator." [2]  As Plan Administrator, Weaver Bros. was required to give Braunstein an

---

[1]  Braunstein had two life insurance policies: (1) a Fortis Voluntary Term Life Policy, Policy Number 4,040,343; and (2) a Fortis Life Policy, Policy Number 52,654.  Joint Exhibits ("J. Exs.") 1-4.  The Court has reviewed both policies.  Because the parties agree that the policies' terms are "substantially identical," the Court will refer to them as one Life Insurance Plan. (Doc. No. 50 at 12.)

[2]  Fortis Benefits Insurance Company is now known as Union Security Insurance Company. (Doc. No. 23 at 1 n.1.)  Union Security Insurance Company operates under the trade name Assurant Employee Benefits.  The entity known as Union Security Insurance Company will be referred to in this Opinion as "Fortis."

As Claims Administrator, Fortis was a fiduciary under the Plan.  Weaver Bros., as Plan Sponsor and Plan Administrator, was also a fiduciary.

adequate SPD and refrain from affirmatively misleading her about the terms of her Life Insurance Plan.

After enrolling in the Plan, Braunstein was diagnosed with cancer.  To ensure that her beneficiaries received the Plan life insurance proceeds after her death, she consulted with Weaver Bros. before going on disability leave.  Sandra Colangelo was Weaver Bros.' Human Resources Manager and was named as Plan Administrator in the Plan documents.  On October 11, 2009, Braunstein consulted with Colangelo who assured Braunstein that her benefits would continue as if she was an active employee while she was out on disability leave.  Braunstein then began collecting short-term disability benefits.  In January 2010, Braunstein's condition worsened and she began collecting long-term disability benefits.  On January 21, 2011, one year and three months after she began disability, Braunstein passed away.  In February 2011, her beneficiaries filed a claim for the money guaranteed to them under the Plan, but their claim was rejected by Fortis.  Unbeknownst to Weaver Bros. and Braunstein, under the terms of the Plan as interpreted by Fortis, and as now asserted by Weaver Bros. in this litigation, Braunstein's coverage lapsed on October 11, 2010, one year after she began short-term disability and ceased what Fortis describes as "active work" with the company.  According to Weaver Bros., Braunstein had the right to continue her benefits by converting the policy to an "individual policy" within thirty-one days after the one-year period, but she did not exercise this right because, as noted, she was unaware of the need to do so.

On March 8, 2011, after learning that the claim had been rejected, Colangelo wrote Fortis the following letter, in pertinent part:

> Deborah left our office on October 15, 2009 under a leave of absence to receive intense chemotherapy.  Due to her doctor's chemotherapy treatment plan, Deborah satisfied our company's short term disability elimination period and became eligible to

2

receive [short-term disability] benefits on October 30, 2009.

\*      \*      \*

However, in early January 2010, Deborah's health worsened and she elected to pursue her option for benefits under our Long Term Disability Plan.  She was approved . . . and her coverage began on January 14, 2010.

\*      \*      \*

. . . Deborah was never terminated by us because **our position was that she remained an active employee** who would return to work at any time.  In accordance with our guidelines and employment practices, we feel that the date used by you in determining the "Maximum Benefit Period" under the [Fortis] Life Policy should be January 14, 2010.  It was not until January 14, 2010, when she qualified for Long Term Disability, that we were actually made aware of the seriousness of her health situation and that she would no longer be able to perform material duties of her position as Account Manager.  Until then it was our understanding that after weeks of chemotherapy, Deborah would be returning to work. Therefore, during the time she was out on Short Term Disability it was our responsibility to maintain her position in every way.  In addition, **up until January 14, 2010, we promised Deborah that we would continue her benefits through our organization just like we do for all active employees.**

\*      \*      \*

Please take this information into consideration when reviewing her death claim.  **It is our position that her coverage eligibility under the "Maximum Benefit Period" began on January 14, 2010.**  Deborah passed away on January 21, 2011.  This was well within the 31 day period for her to elect her conversion option to an individual policy.  On this basis, **the proper course for [Fortis] to follow is to pay Deborah Braunstein's death claim.**

(J. Ex. 44)  (emphasis added.)

Fortis still refused to pay Braunstein's death claim.  On August 26, 2011, rather than face a law suit by Braunstein's beneficiaries for failure to pay the life insurance proceeds, Weaver

Bros. filed its own Complaint against Braunstein's beneficiaries, which included her daughter, Jacqueline Braunstein, her son, Micah Braunstein, and her two grandchildren, Isaiah Jones and Tayler Mayne (collectively, the "Braunstein Beneficiaries"), pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, et. seq.  In this case, Weaver Bros. seeks a "determination that it had no obligation to inform or otherwise assure that Deborah Braunstein transferred her coverage from the ERISA Group Life Plans to an individual life insurance policy."[3]   (Doc. No. 1 at ¶38.)  In turn, the Braunstein Beneficiaries filed counterclaims alleging: (1) breach of fiduciary duties under ERISA, and (2) negligence.  (Doc. Nos. 13 and 44.)  The parties then began a protracted motion practice.

On May 7, 2012, Weaver Bros. filed a Motion for Judgment on the Pleadings, seeking relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, et. seq.  (Doc. No. 50.)  On May 24, 2012, the Braunstein Beneficiaries filed a Response in opposition.  (Doc. No. 53.)  In turn, on June 7, 2012, Weaver Bros. filed a Reply.  (Doc. No. 57.)  Supplemental memoranda were also filed by both parties.  (Doc. Nos. 69, 72.)  On November 16, 2012, a hearing was held on the Motion.

On March 25, 2013, the Court granted in part and denied in part Weaver Bros.' Motion for Judgment on the Pleadings, dismissing only the Braunstein Beneficiaries' counterclaim for negligence.  The Court held, however, that: (1) Weaver Bros. was a fiduciary under ERISA, (2)

---

[3]  The Complaint also named Time Insurance Company and Union Security Insurance Company as Defendants.  As noted supra, Union Security Insurance Company is the current name of Fortis Benefits Insurance Company.  (Doc. No. 23 at 1 n.1.)  The Complaint alleged that Time Insurance Company is an entity related to Fortis Benefits Insurance Company.  (Doc. No. 1 at 7.)  On November 21, 2011, the Braunstein Beneficiaries asserted crossclaims against Time Insurance Company and Union Security Insurance Company.  (Doc. No. 22.)  On June 20, 2012, both Time Insurance Company and Union Security Insurance Company were dismissed as parties to this lawsuit.  (Doc. No. 61.)  The only parties remaining in this litigation are Weaver Bros. and the Braunstein Beneficiaries.

Weaver Bros. breached its fiduciary duty by failing to provide Braunstein with an adequate SPD, as required by ERISA, and by "actively misleading her about Plan terms and by failing to inform [Braunstein] of her conversion rights when the company knew [she] was severely ill," and (3) the Braunstein Beneficiaries were entitled to relief in their individual capacities under ERISA .[4]  See No. 11-5407, 2013 WL 1195529 (E.D. Pa. Mar. 25, 2013); (Doc. No. 79).  Thereafter, both parties filed cross-motions for summary judgment, and both motions were denied by this Court. (Doc. Nos. 112, 114, 116, 117, 118, 119, 128, 129.)

On March 4, 2014, the Court held a non-jury trial in this case on: (1) Weaver Bros.' claim for declaratory judgment, and (2) the Braunstein Beneficiaries' counterclaim for breach of fiduciary duties.[5]  The matter is now ripe for disposition.  Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court will make special findings of fact and conclusions of law, as set forth below.  For reasons that follow, this Court finds in favor of the Braunstein Beneficiaries on their counterclaim for breach of fiduciary duties, and against Weaver Bros. on its request for a declaratory judgment.

---

[4]  Because the Court's March 25, 2013 Opinion covers the same subject matter as the claims at issue here, sections of the prior Opinion will be used in this Opinion.  The Court's prior Opinion, however, concerned a motion for judgment on the pleadings, while this Opinion follows a non-jury trial.  When deciding a motion for judgment on the pleadings, a court must consider only those documents contained in the pleadings.  In addition, "the trial court must view the facts in the pleadings in the light most favorable to plaintiff. . . ."  Shelly v. Johns-Manville Corp., 798 F.2d 93, 97 n.4 (3d Cir. 1986).  See also Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008) (quoting Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 290 (3d Cir. 1988)).  Following a non-jury trial, the Court is required to review the whole record and weigh each witness' credibility. Fed. R. Civ. P. 52(a).  Accordingly, the Court may consider evidence outside the pleadings, including trial testimony and exhibits, when making findings of fact and conclusions of law.

[5]  At trial, Sandra Colangelo, the Human Resources Manager and Plan Administrator, testified on behalf of Weaver Bros.  Jacqueline Braunstein testified on behalf of the Braunstein Beneficiaries.

## II.  SPECIAL FINDINGS OF FACT PURSUANT TO FED. R. CIV. P. 52(a)(1)

### A.  The Summary Plan Description

1.  After starting her employment at Weaver Bros., Deborah Braunstein enrolled in the Life Insurance Plan.  She was given a booklet with information concerning the Plan.  (Colangelo Testimony (hereinafter "C.T.") at 23:18-24:4.)

2.  The booklet contained two major sections, a lengthy section titled "Certificate of Insurance" and a smaller section titled "Summary Plan Description." [6] (J. Exs. 1-4.)

3.  Toward the end of the booklet, at the top of page thirty-eight, is the heading "SUMMARY PLAN DESCRIPTION."  (J. Ex. 4 at 47.)

4.  This is the first time the words "summary plan description" appear in the booklet. (J. Ex. 4.)

5.  Under the heading "SUMMARY PLAN DESCRIPTION" is the following paragraph:

> This Summary Plan Description is issued to you in compliance with the Employee Retirement Income Security Act of 1974 (ERISA).  Included within this document is your Certificate of Insurance, issued by Fortis Benefits Insurance Company in compliance with state law.  Your Summary Plan Description does not replace or modify the Master Policy issued by Fortis Benefits Insurance Company in any way.  The Master Policy is the contract which sets forth the terms and conditions of the benefits the Plan Sponsor chose to provide in its welfare benefit plan.  The Master Policy may be amended at any time by agreement between the

---

[6] As described in note 1 supra, Braunstein enrolled in two life insurance policies.  There are two Certificates of Insurance and two Summary Plan Descriptions, one for each policy.  (J. Exs. 1-4.)  The Certificates and SPDs for each policy were distributed to Braunstein in booklets that are "substantially identical."  (Doc. No. 50 at 12.)  The Court has considered both Certificates and SPDs in their entirety, even if only one is discussed or quoted herein.  In this regard, when quoting from the Plan, the Court will only refer to Policy Number 4,040,343 (J. Ex. 4).

Plan Sponsor and Fortis Benefits Insurance Company.  The Master Policy may be terminated at any time by the Plan Sponsor or may be terminated by Fortis Benefits Insurance Company for non-payment of premium or for failure to meet the Master Policy's minimum participation requirements.  The Plan Administrator has the obligation to prepare, issue, amend and file the Summary Plan Description (SPD) and is solely responsible for its contents.

(Id. at 47.)

**6.** The Certificate of Insurance, mentioned in the SPD, is not part of the SPD.

**7.** The SPD lacks basic information that must be given to a plan participant.

**8.** The SPD does not contain a statement clearly identifying circumstances which may result in disqualification, ineligibility, denial, loss, or forfeiture of benefits under the Plan.  (Id.)

**9.** The SPD does not inform plan participants that Plan benefits terminate one year and thirty-one days after ceasing "active work."  (Id.)

**10.** The SPD does not inform plan participants about the Plan's conversion right. (Id.)

**11.** The SPD does not summarize a participant's rights and benefits under the Plan. (Id.)

**B.  The Terms of the Life Insurance Plan**

**12.** Braunstein's rights and benefits under the Life Insurance Plan are described in the portion of the Plan booklet titled "Certificate of Insurance."  (J. Ex. 4.)

**13.** The Certificate is thirty-seven pages, and has a table of contents with twelve sections and sixty-eight subsections.  (Id. at 10-11.)

**14.** The provisions relied on by Weaver Bros. in the Certificate of Insurance to prove that the Braunstein Beneficiaries are not entitled to coverage are found on pages three, four, nine, fourteen, and fifteen.  (Id.)

15.     On pages three and four, under the "GENERAL DEFINITIONS" section of the

Certificate are, among other things, the following terms:

*Active work* means working *full-time* for the *policyholder* or an *associated company* at your usual place of business.

*       *       *

*Covered person* means an eligible employee or member of the *policyholder*, or an *associated company* who has become insured for a coverage.

*       *       *

*Full-time* means working at least 20 hours per week, unless indicated otherwise in the *policy*.

*       *       *

*Policy* means the group policy issued by us to the *policyholder* that describes the benefits for which you may be eligible.

*Policyholder* means the entity to whom the *policy* is issued.

*       *       *

We, us, and our mean Fortis Benefits Insurance Company.

You and your mean an employee or member of the *policyholder* or an *associated company* who has met all the eligibility requirements for a coverage.

(<u>Id.</u> at 12-13.) (emphasis in original).

16.     On page nine, the section entitled "ELIGIBILITY AND TERMINATION

PROVISIONS FOR YOU" contains the following provision:

When Your Insurance Ends

Your insurance will end on the date:
- the *policy* ends;
- the *policy* is changed to end the insurance for your *eligible class*;
- you are no longer in an *eligible class*;

8

- you stop *active work*; or
- a required contribution was not paid.

(Id. at 18.) (emphasis in original).

17.    After Braunstein began collecting short-term disability benefits, she eventually

became eligible for the following life insurance "DISABILITY BENEFIT," which

is described on page fourteen of the Certificate of Insurance:

> If you stop *active work* before age 65 because you become
> *disabled* while insured under the *policy* and remain *disabled* for the
> *qualifying period*, your *life insurance* will continue for the period
> outlined in the Maximum Benefit Period provision.  Once the
> *qualifying period* is satisfied, no further premium is due for you
> while you remain *disabled* for the amount of *life insurance* that is
> being continued.

(Id. at 23.) (emphasis in original).

18.    The "Maximum Benefit Period" is also found on page fourteen, and is described

in pertinent part as follows:

> If you become *disabled* before your 60th birthday, your insurance
> will continue as long as you are *disabled*, but not past the earlier of
> age 65, or the date you *retire*.  If you become *disabled* on or after
> your 60th birthday, but before age 65, your insurance may continue
> for up to 1 year, but not past the earlier of age 65, or the date you
> *retire*.
>
> *                *                *
>
> If your amount of insurance reduces or ends while you are
> *disabled*, you can apply for an individual policy.  See the
> Conversion to an Individual Policy provision.

(Id.) (emphasis in original).

19.    Braunstein was sixty-one when she became "disabled."

20.    On page fifteen, the section entitled "Conversion to an Individual Policy" states

the following:

> If any or all of your group *life insurance* ends, you can apply for

> any individual policy offered by us (*conversion policy*).  You must apply and pay the premium within 31 days.  The individual policy may be any we offer for conversion.   No *proof of insurability* is required.
>
> You may convert up to the full amount that ended.
>
> If you die within 31 days after your *life insurance* ends, we will pay to your *beneficiary* the amount you could have converted, whether or not you applied or paid the premium.[7]
>
> (Id. at 24-25.) (emphasis in original).

21.    The "Conversion to an Individual Policy" section does not clarify when the life insurance ends.

22.    The Certificate of Insurance does not clearly and simply describe the conversion right.

23.    Braunstein was unaware that her life insurance policy may have ended on October 11, 2010.

24.    Less than three months later, Braunstein passed away.

**C.  The Plan Administrators**

25.    Weaver Bros. and Sandra Jean Colangelo are Plan Administrators under ERISA.

26.    Colangelo is the Vice President and Human Resources Manager for Weaver Bros. (J. Ex. 9; C.T. at 18:15-19.)

27.    At trial, Colangelo testified that, as Human Resources Manager, she "handle[s]" insurance "enrollment and employee benefits" at Weaver Bros.  (C.T. at 19:15-19.)

28.    She admitted that when an employee has a question about their benefits, she is

---

[7]  Although the terms of the Life Insurance Plan as set forth in the Certificate of Insurance may be understood by an attorney or someone working with it on a frequent basis, it lacks the clarity necessary to inform a plan participant of its terms.  See infra Section (IV)(B)(3).

their "point person."  (Id. at 55:16-19.)

29.  She testified that she is the only person at the company that employees can talk to about enrolling, disenrolling, and updating their benefits.  (Id. at 55:20-23.)

30.  On page thirty-nine of the Plan's informational booklet, referred to above, are the words:

> **Plan Administrator:** Weaver Bros. Insurance Associates, Inc.
> Ms. Sandy Colangelo
> 7315 Wisconsin Avenue
> Suite 900E
> Bethesda, MD 20814
> (301) 986-4400

(J. Ex. 4 at 48.)

31.  Colangelo is aware that her name is specifically listed in the Life Insurance Plan as a Plan Administrator.  (C.T. at 56: 4-9.)

32.  Colangelo is the only employee listed as a Plan Administrator.  (Id.)

33.  Colangelo admitted that as a Plan Administrator she is a fiduciary.  (Id.)

34.  Despite being a fiduciary, before the inception of this litigation Colangelo had no knowledge of critical aspects of her responsibilities as a fiduciary under ERISA. (Id. at 68:11-17.)

35.  She received no training on the obligations of an ERISA fiduciary.  (Id. at 56:10-14.)

36.  Weaver bros. is also listed in the Life Insurance Plan as a Plan Administrator.  (J. Ex. 4 at 48.)

37.  Weaver Bros. admits that it is a fiduciary under ERISA because it is specifically listed as a Plan Administrator.  (Motion Hearing Transcript ("Mot. Hr'g Tr.") 18:14-19:2, Nov. 16, 2012.)

**38.**     As Plan Administrators, both Colangelo and Weaver Bros. owed fiduciary duties

to Braunstein.

**D.  Material Misrepresentations Made By the Plan Administrator**

**39.**     On October 4, 2006, Braunstein began working for Weaver Bros. as a Senior

Account Executive in the Commercial Lines Department.  (Id. at 21:2-3; 22:19-

21.)

**40.**     That same day, Braunstein met with Colangelo.  (Id. at 22:25- 23:5.)

**41.**     During their meeting, Colangelo helped Braunstein enroll in the Life Insurance

Plan, specifically Policy Number 52,654 and Policy Number 4,040,343, both

administered by Fortis.  (Id. at 25:6-18; 27:8-24; J. Exs. 2, 4, and 9.)   Policy

Number 52,654 provided life insurance benefits of $100,000 with premiums paid

by Weaver Bros.  Policy Number 4,040,343 provided life insurance benefits of

$20,000 with premiums paid by the employee.  (J. Exs. 1, 2, 3, 4, 11, and 12.)

**42.**     Braunstein also enrolled in Weaver Bros.' short-term and long-term disability

plans.  Short-term and long-term premiums were paid by Braunstein.  (J. Exs. 14

and 15; C.T. at 31:9-25.)

**43.**     On October 4, 2006, the day she enrolled Braunstein in the Life Insurance Plan,

Colangelo, a fiduciary, had not read the Plan.  (C.T. at 67: 9-15.)

**44.**     On October 4, 2006, the day she enrolled Braunstein in the Life Insurance Plan,

Colangelo, a fiduciary, had not read the SPD.  (Id.)

**45.**     Three years later, in October 2009, Braunstein was diagnosed with cancer.  Her

doctors explained that she would need to undergo treatment.  Braunstein informed

Colangelo and the owners of Weaver Bros. of her condition and need for

treatment.  (C.T. at 33:14-34:12.)

46.     Braunstein continued to work on a regular basis while undergoing treatment.  (Id. at 33:23- 34:2.)

47.      By mid-October 2009, Braunstein informed Colangelo and Weaver Bros. that she would need to go on short-term disability leave to continue treatment.  (Id. at 34:5-12.)

48.     On October 11, 2009, Braunstein's last full day in the office, she met with Colangelo again. (Id.)

49.     Colangelo reviewed the procedure for enrolling in the short-term disability plan with Braunstein, and Braunstein completed the necessary paperwork.  (Id. at 35: 21-36: 5; 38:20-24.)

50.     During their meeting, Braunstein expressed a desire to return to work after her treatment, and Colangelo informed her that Weaver Bros. would keep her position open, keep her office intact, and distribute her work to other employees until she was able to return to the company.  (Id. at 36:6-37:23.)

51.     Colangelo explained to Braunstein that "her accounts were her accounts, but that other [employees] were going to help out."  (Id. at 36:23-25.)

52.     Colangelo and Braunstein agreed that if an employee who was "filling in" for Braunstein had a question about one of her accounts, they could contact her at home.  (Id. at 37:1-7.)

53.     Colangelo told Braunstein that she was still considered an employee of the company and that Weaver Bros. was "not going to terminate her."  (Id. at 37:16-20.)

54.     Colangelo told Braunstein that her life insurance benefits would continue after she

began collecting disability insurance payments, and that she would maintain her life insurance benefits like any "active employee" at Weaver Bros. [8] (Id. at 58:12-19.)

55.     Accordingly, Colangelo told Braunstein to continue to make her insurance payments under Policy No. 4,040,343.  (Id. at 58:24-59:3.)

56.     Braunstein continued to send insurance payments to Weaver Bros., who forwarded the payments to Fortis.  (Id. at 59:6-12.)

57.     Weaver Bros. continued to make payments on Policy No. 52,654.  (Id. at 60:16-17.)

58.     On October 11, 2009, the day she advised Braunstein that her benefits would continue while she was on leave, Colangelo still had not read the Life Insurance Plan or the SPD.

59.     Regardless of the fact that she had not read the Plan documents, and even though she knew of Braunstein's serious medical condition, Colangelo still assured Braunstein that Weaver Bros. considered her an "active employee" and that her benefits would continue.  (Id. at 58:12-19.)

60.     Braunstein periodically assisted Weaver Bros. by working from home while out on disability leave.  (Id. at 16-22.)

61.     Colangelo admitted that after Braunstein went on short-term disability, she continued to "perform material duties of her position."  (J. Ex. 44.)

---

[8]  In this case, Weaver Bros. now contends that, despite Colangelo assuring her that she was considered an "active employee," Braunstein ceased "active work" for purposes of her Life Insurance Plan and therefore was no longer covered under the Plan.  The difference between "active employee" and an employee who performs "active work" would not be intelligible to a lay person.

**62.**   Colangelo also admitted that Braunstein periodically came into the office to
complete work.  (<u>Id.</u>)

**63.**   As discussed, employees called Braunstein at home to ask questions about her
accounts.[9]  (<u>Id.</u>)

**64.**   Braunstein's physical condition worsened, and in January 2010, she began
receiving long-term disability benefits.  (C.T. at 62:12-16.)

**65.**   On February 16, 2010, Colangelo faxed Braunstein a blank beneficiary
designation form.  The fax stated that Weaver Bros. was updating the beneficiary
designations for all employees' life insurance plans.  (J. Ex. 28.)

**66.**   On March 8, 2010, Braunstein faxed Colangelo the completed forms naming her
children and grandchildren as beneficiaries.  In the fax, Braunstein asked
Colangelo to look over the forms and to make sure she "included the necessary
information."  (J. Ex. 30.)

**67.**   Colangelo faxed back a response that day - "I have all others"- confirming that
she had all necessary paperwork.  (<u>Id.</u>)

**68.**   On March 8, 2010, the day of her last fax to Braunstein, Colangelo had still not

---

[9]   The Plan defines "active work" as "working full-time for the policyholder. . . at your usual
place of business."  (J. Ex. 4 at 12.)  "Full-time" is defined in the Plan as "working at least 20
hours per week . . . ."  (<u>Id.</u>)  The Braunstein Beneficiaries do not argue that Braunstein met the
twenty hour per week in-office requirement while on disability leave.  The Court notes,
however, that Braunstein continued to work.  Her work, along with Colangelo's assurance of
coverage, establishes that Weaver Bros. considered Braunstein an "active employee" who was
entitled to coverage.  (C.T. at 58: 16-19.)

Therefore, prior to this litigation, when it appeared that Fortis was the responsible party to pay
Braunstein's life insurance benefit, Weaver Bros.' position was that Braunstein was a "covered
person" at the time of her death.  Now that litigation has ensued in which Weaver Bros. is
being held accountable to pay the claim, Weaver Bros. has changed course, disavowing their
prior position by arguing that Braunstein ceased to be an "active employee" on October 10,
2009, when she stopped working full-time at her usual place of business.

read the Life Insurance Plan or SPD.

69.  At no time prior to this litigation did Colangelo ever read the SPD or the Life
Insurance Plan.  (Id. at 9-15.)

70.  Because she never read the Plan, Colangelo was not aware that Braunstein's
benefits might lapse one year and thirty-one days after she ceased what Fortis
termed "active work."

71.  Because she never read the Plan, Colangelo was not aware that Braunstein could
extend her life insurance coverage by exercising her conversion right.

72.  Because she never read the Plan, during every communication she had with
Braunstein, Colangelo misled Braunstein about the terms of the Plan.  (C.T. at
62:8-11.)

73.  Colangelo told Braunstein her coverage would continue even though it may not
have continued because Braunstein ceased performing what the Plan termed
"active work."

74.  Operating under the assumption that Braunstein was covered under the Plan,
Colangelo failed to inform Braunstein that she may in fact lose her benefits unless
she exercised her conversion option.  (Id. at 14-22.)

75.  On January 21, 2011, Braunstein passed away.  (C.T. at 46:18-21.)

76.  After Braunstein's death, her daughter, Jacqueline Braunstein, contacted
Colangelo. (Jacqueline Braunstein Test. (hereinafter "B.T.") at 96:2-14.)

77.  Colangelo told Jacqueline Braunstein that she and the other beneficiaries were
entitled to the Life Insurance proceeds and even "gave [Jacqueline Braunstein] a
breakdown of all the benefits that were to come [to the Braunstein

Beneficiaries]."  (<u>Id.</u> at 96:12-14.)

**78.**   Jacqueline Braunstein and the rest of the beneficiaries attempted to collect the

monies owed to them under the Life Insurance Plan, but their claim was rejected

by Fortis.  (<u>Id.</u> at 98:9-21; Doc. No. 121 at 4.)

**79.**   Fortis informed the Braunstein Beneficiaries that Deborah Braunstein was not

entitled to benefits under the Life Insurance Plan because her coverage had

lapsed.  (<u>Id.</u>)

**80.**   As noted previously, on March 8, 2011, Colangelo wrote to Fortis and explained

that Weaver Bros. considered Braunstein an "active employee" until January 14,

2010, the day she began receiving long term disability benefits.  (J. Ex. 44.)

**81.**   Colangelo's letter to Fortis states, in part:

Deborah left our office on October 15, 2009 under a leave of
absence to receive intense chemotherapy.  Due to her doctor's
chemotherapy treatment plan, Deborah satisfied our company's
short term disability elimination period and became eligible to
receive [short-term disability] benefits on October 30, 2009.

*        *        *

As a Commercial Lines Senior Account Manager, Deborah
continued to be available on a regular basis to contribute to her
accounts.  Since most of Deborah's large commercial accounts
renewed on January 1, 2010, this process began in October.
Despite her treatment, Deborah continued to perform material
duties of her position as Account Manager.  She was available to
other staff members who helped work on her accounts.  She
periodically came into the office.  Furthermore, our company did
not fill her position nor did we replace her.  Employees called upon
her to discuss her accounts and she was always included in our
company functions.  We also continued to maintain her private
office in anticipation of her return.

However, in early January 2010, Deborah's health worsened and

she elected to pursue her option for benefits under our Long Term Disability Plan.  She was approved . . . and her coverage began on January 14, 2010.

*       *       *

In summary, Deborah was never terminated by us because **our position was that she remained an active employee** who would return to work at any time.  In accordance with our guidelines and employment practices, we feel that the date used by you in determining the "Maximum Benefit Period" under the [Fortis] Life Policy should be January 14, 2010.  It was not until January 14, 2010, when she qualified for Long Term Disability, that we were actually made aware of the seriousness of her health situation and that she would no longer be able to perform material duties of her position as Account Manager.  Until then it was our understanding that after weeks of chemotherapy, Deborah would be returning to work.  Therefore, during the time she was out on Short Term Disability it was our responsibility to maintain her position in every way.  In addition, **up until January 14, 2010, we promised Deborah that we would continue her benefits through our organization just like we do for all active employees.**  It was always Deborah's desire to return to work as soon as she could.  It would have been insensitive, irresponsible and inappropriate to discontinue her benefits through our company.  Up until Deborah's death, we continued to treat her as an employee and this included paying for her health and life insurance as well.

Please take this information into consideration when reviewing her death claim.  **It is our position that her coverage eligibility under the "Maximum Benefit Period" began on January 14, 2010.**  Deborah passed away on January 21, 2011.  This was well within the 31 day period for her to elect her conversion option to an individual policy.  On this basis, **the proper course for [Fortis] to follow is to pay Deborah Braunstein's death claim.**

(Id.)  (emphasis added.)

82.    In her letter, Colangelo agrees that Weaver Bros. considered Braunstein an "active employee" until January 14, 2010, and continued her benefits accordingly.

83.    On April 14, 2011, Fortis rejected the Braunstein Beneficiaries' claim.  (Doc. No.

18

121 at 4.)

84.   The Braunstein Beneficiaries appealed Fortis' decision.  On June 3, 2011, Fortis
      again rejected their claim.  (J. Ex. 47.)

85.   On June 29, 2011, R. Scott Gardner, Esquire, prior counsel for the Braunstein
      Beneficiaries, sent a letter to Colangelo asserting that the denial of benefits by
      Fortis was due to Weaver Bros.' failure to inform Deborah Braunstein of her right
      to convert the Life Insurance Plan to an individual policy.  (Doc. No. 1 at 109–
      10.)

86.   The letter also alleged that this failure was a breach of fiduciary duty under
      ERISA.  (Id.)

## III.   CONCLUSIONS OF LAW

On both Weaver Bros.' claim for declaratory judgment, and the beneficiaries'
counterclaim for breach of fiduciary duties, the Court makes the following conclusions of law:

### A.   Weaver Bros. is a Fiduciary under ERISA

The threshold issue in this case is whether Weaver Bros. is a fiduciary under ERISA.
One way to acquire fiduciary status under ERISA is by "being named as the fiduciary in the
instrument establishing the employee benefit plan." Jordan v. Fed. Exp. Corp., 116 F.3d 1005,
1014 n.16 (3d Cir. 1997) (citing 29 U.S.C. § 1102(a)(2); quoting Glaziers & Glassworkers Union
Local No. 252 Annuity Fund v. Newbridge Secs., Inc., 93 F.3d 1171, 1179 (3d Cir.1996)).
Section 1102(a)(2) of ERISA provides:

(a)  Named fiduciaries

                              *      *      *

(2) For purposes of this subchapter, the term "named fiduciary"
means a fiduciary who is named in the plan instrument, or who,
pursuant to a procedure specified in the plan, is identified as a

19

> fiduciary (A) by a person who is an employer or employee
> organization with respect to the plan or (B) by such an employer
> and such an employee organization acting jointly.

29 U.S.C. § 1102(a)(2).  Weaver Bros. admits that it is a fiduciary pursuant to 29 U.S.C. §

1102(a)(2) because it is named as the Plan Administrator in the Plan.  (Mot. Hr'g Tr. 18:14–19:2,

Nov. 16, 2012).  Colangelo, a Vice President at Weaver Bros., is also named as a Plan

Administrator in the Plan and agrees that she is a fiduciary.  (C.T. at 56:4-9.)  Despite these

agreements and ERISA's clear language, Weaver Bros. argues that it cannot be held liable as a

fiduciary for Colangelo's failure to read the Plan and SPD or her subsequent misrepresentations

to Braunstein because Colangelo's role as fiduciary was limited to "clerical and administrative

duties."  (Doc. No. 133 at 38.)

Even if Colangelo had not admitted to her fiduciary status at trial, her actions belie the

argument that she served a mere clerical and administrative role in the administration of the Life

Insurance Plan.  Colangelo testified that during the course of her job performance, she counseled

participants about the administration of their benefits.  Indeed, she advised Braunstein about her

benefits, misinforming her that they would continue while she was on disability leave.  Clearly,

Colangelo's role in the administration of the company's insurance plans went beyond performing

clerical and administrative tasks.

The Third Circuit has held that an employer can be held liable for breach of fiduciary

duties when an employee who speaks as a Plan Administrator makes affirmative

misrepresentations to participants about their plans.  See Smith v. Hartford Ins. Grp., 6 F.3d 131,

141 n. 13 (3d Cir. 1993) ("[A]n employer can be liable under ERISA in his fiduciary capacity . . .

on [a] breach of fiduciary duty [theory] . . . for affirmative misrepresentations such as those

made by [the personnel director] here.) (citing Eddy v. Colonial Life Ins. Co. of America, 919

F.2d 747, 750–51 (D.C.Cir.1990) (misrepresentation to employee requiring conversion rights under health insurance plan gives rise to breach of fiduciary duty claim under ERISA)).  Because Colangelo is listed as a Plan Administrator in the Plan documents, and as a fiduciary was responsible for more than just clerical and administrative duties, Weaver Bros. can be held liable for her misrepresentations.

   **B.**   **Weaver Bros. Breached Its Fiduciary Duty to Deborah Braunstein by Providing an Inadequate Summary Plan Description and by Making Material Misrepresentations to Her about the Life Insurance Plan**

   **1.   Weaver Bros. Provided An Inadequate Summary Plan Description**

Weaver Bros. contends that it fulfilled its fiduciary duties to Braunstein under ERISA by simply furnishing her with the SPD.  The company argues that the SPD did not have to notify her about her right to convert to an individual plan or about the fact that she was entitled to remain a plan participant for only one year following the end of her "active work" on October 11, 2009. (Doc. No. 50 at 26; Mot. Hr'g Tr. 44:11–13, Nov. 16, 2012.)

The Braunstein Beneficiaries do not dispute that Weaver Bros. provided Braunstein with a document which contained a heading "Summary Plan Description" on page thirty-eight. Instead, they argue that Weaver Bros. breached its fiduciary duty by failing to provide an adequate SPD as defined in 29 U.S.C. § 1022, which provides, in pertinent part:

> (a) A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries . . . . The summary plan description shall include the information described in subsection (b) of this section, shall be written <u>in a manner calculated to be understood by the average plan participant</u>, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.

*       *       *

> (b) The summary plan description shall contain the following information: . . . <u>circumstances which may result in disqualification, ineligibility, or denial or loss of benefits</u> . . . .

29 U.S.C. § 1022 (emphasis added).

Additionally, the Braunstein Beneficiaries argue that the SPD here is deficient under 29 C.F.R. § 2520.102-3(l), which requires an SPD to include:

> [A] statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, [or] forfeiture . . . of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits required by paragraph[] (j) . . . .

Paragraph (j) requires an SPD to include, among other things, "a statement of the conditions pertaining to eligibility to receive benefits." <u>Id.</u> § 2520.102-3(j)(2).

As discussed above, the SPD given to Braunstein is located toward the end of the informational booklet on page thirty-eight. (J. Ex. 4 at 47.) At the top of page thirty-eight is the heading "Summary Plan Description." (<u>Id.</u>) This is the first time these words appear in the booklet. Under them is the following paragraph:

SUMMARY PLAN DESCRIPTION

> This Summary Plan Description is issued to you in compliance with the Employee Retirement Income Security Act of 1974 (ERISA). Included within this document is your Certificate of Insurance, issued by Fortis Benefits Insurance Company in compliance with state law. Your Summary Plan Description does not replace or modify the Master Policy issued by Fortis Benefits Insurance Company in any way. The Master Policy is the contract which sets forth the terms and conditions of the benefits the Plan Sponsor chose to provide in its welfare benefit plan. The Master Policy may be amended at any time by agreement between the Plan Sponsor and Fortis Benefits Insurance Company. The Master Policy may be terminated at any time by the Plan Sponsor or may be terminated by Fortis Benefits Insurance Company for non-payment of premium or for failure to meet the Master Policy's minimum participation requirements. The Plan Administrator has the obligation to prepare, issue, amend and file the Summary Plan Description (SPD) and is solely responsible for its contents.

(Id. at 99.)

The notion that Weaver Bros. fulfilled its duties under ERISA by providing Braunstein with this SPD is untenable.  Plan Administrators are not simply required to provide participants with a document titled "Summary Plan Description," but to provide them with SPDs that meet ERISA's requirements.  See 29 U.S.C. §§1021, 1022.  This cursory, one-paragraph SPD does not comply with ERISA because it lacks the basic information that must be given to a plan participant as required by the above-cited statutory texts.

The SPD is deficient under 29 U.S.C. § 1022 because it does not inform Braunstein "in a manner calculated to be understood by the average plan participant" about her right to convert her group Life Insurance Plan to an individual plan, or about the fact that her benefits could terminate one year after ceasing "active work."  Both of these Plan provisions qualify as "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b).  Similarly, these Plan provisions also qualify as "circumstances which may result in disqualification, ineligibility, or denial, loss, [or] forfeiture . . . of [a] benefit[] that a participant or beneficiary might otherwise reasonably expect the plan to provide."  Consequently, their omission from the SPD also violates 29 C.F.R. § 2520.102-3(l).  Because Weaver Bros. provided a deficient SPD to Braunstein, it violated its fiduciary duties under ERISA.[10]

---

[10]  In its Supplemental Conclusions of Law, Weaver Bros. cites to Prouty v. Hartford Life & Acc. Ins. Co. No. 12-12097, 2014 WL 554556 (D. Mass. Feb. 12, 2014), a recent Massachusetts District Court decision to support its position that the SPD provided to Braunstein was not required to contain a statement about her conversion rights.  However, Prouty is inapposite to this case.  The SPD at issue in Prouty contained both a statement alerting participants to circumstances that may result in loss of coverage and "provisions . . . about the conversion privilege" that were "indisputably written in a user-friendly manner with clear language."  (Id. at *5.)  Here, the SPD contained neither of those statements.  The Prouty court noted that ERISA "does not require that the SPD even include notification to participants and beneficiaries of any conversion rights."  (Id.)  However, while ERISA does not use the

**a. The Certificate Of Insurance Is Not Part Of The Summary Plan Description**

Alternatively, Weaver Bros. argues that the Certificate of Insurance is part of the SPD.

During a hearing on Plaintiff's Motion for Judgment on the Pleadings, counsel for Weaver Bros.

stated:

> The fact that [the right to convert to an individual policy] cannot be summarized in a single sentence doesn't mean that it's defective. In order to apprise yourself of your rights under this policy, you have to read the forty [sic] pages that are included, not only the — final pages, but the Certificate of Insurance.
>
> Now, there is no case that says that because it is forty [sic] pages, it is therefore defective, and a plan administrator has breached its fiduciary duty.
>
> *       *       *
>
> [I]f you read this, it says that the Summary Plan Description includes the Certificate of Insurance.  You have to read it, yes.  You have to read forty [sic] pages.  That doesn't make it defective.  The fact that — you know, because a reasonable — a reasonable person can be asked to read forty [sic] pages.  It doesn't mean that it is unclear.  It takes some time, but there are multiple provisions in here, and . . . you have to read them.  It doesn't mean it has to be done on the back of a — of a Cracker Jack box.

(Mot. Hr'g Tr. 44:17–45:21, Nov. 16, 2012.)

Counsel's arguments are unpersuasive.  First, as a preliminary matter, it is true that the

standard for adequacy of an SPD is not necessarily the length of the description.  The problem

here is with the description itself.  The paragraph that describes the SPD makes reference to the

Certificate being "[i]ncluded within this document."  (Doc. No. 1 at 99.)  This statement clearly

---

language "conversion right" as an item that must be contained in an SPD, this Court disagrees with <u>Prouty</u> and finds that a "conversion right" must be included in an SPD where, as here, failure to exercise the right functions as a "circumstance[] which may result in disqualification, ineligibility, or denial or loss of benefits."  29 U.S.C. § 1022(b).  The language in this section undoubtedly covers a loss of benefit for failure to exercise the "conversion right."

means that the Certificate of Insurance is different from the SPD.  Thus, the Certificate of Insurance is not part of the SPD.[11]

In Hansen v. Continental Ins. Co., 940 F.2d 971 (5th Cir. 1997), abrogated on other grounds by CIGNA Corp. v. Amara, 131 S. Ct. 1866 (2010), the Fifth Circuit held:

> The certificate of insurance, which sets out the full terms of the policy, is no[t] part of the summary plan description.  Continental confounds the *policy* with a *summary* of the policy, collapsing two distinct documents into one.  By definition, a summary description of the policy does not reproduce each and every term, word for word, of the policy.  Indeed, the very purpose of having a summary description of the policy is to enable the average participant in the plan to understand readily the general features of the policy, precisely so that the average participant need *not* become expert in each and every one of the requirements, provisos, conditions, and qualifications of the policy and its legal terminology.

Id. at 981. (emphasis in original.)

The reasoning of Hansen is persuasive here.  There is a clear delineation in the booklet provided to Braunstein between the Certificate of Insurance and the SPD, which is located toward the end of the booklet.  The table of contents to the Certificate of Insurance does not list the SPD.  (Doc. No. 1 at 76–77.)  The Certificate of Insurance is not incorporated into the SPD — it is merely included in "this document," which is the booklet.

---

[11]  "ERISA requires, in no uncertain terms, that the summary plan description be 'accurate' and 'sufficiently comprehensive to reasonably apprise' plan participants of their rights and obligations under the plan."  Burstein v. Ret. Account Plan For Emps. of Allegheny Health Educ. & Research Found., 334 F.3d 365, 379 (3d Cir. 2003) (quoting Hansen v. Cont'l Ins. Co., 940 F.2d 971, 981 (5th Cir. 1997), abrogated on other grounds by CIGNA Corp. v. Amara, 131 S. Ct. 1866 (2010)).  "The SPD is the document to which the lay employee is likely to refer in obtaining information about the plan and in making decisions affected by the terms of the plan."  Id.

Thus, the only way a plan participant would know about the terms of the Plan would be by referring to another document, the Certificate of Insurance.  The SPD itself, however, is required to provide the summary of the plan, not another document referred to in the SPD.[12]

Second, the fact that Fortis drafted the SPD and that the Braunstein Beneficiaries dismissed Fortis as a party to this lawsuit does not lend support to Weaver Bros.' argument.  Weaver Bros. is the Plan Administrator.  In the SPD quoted above it states the following: "The Plan Administrator has the obligation to prepare, issue, amend and file the Summary Plan Description (SPD) and is solely responsible for its contents."  (J. Ex. 4 at 47.)  "The plan's administrator, a trustee-like fiduciary, manages the plan, follows its terms in doing so, and provides participants with the summary documents that describe the plan (and modifications) in readily understandable form."  CIGNA, 131 S. Ct. at 1877.

As the Plan Administrator with a fiduciary responsibility, Weaver Bros. is responsible for the contents of the deficient SPD, and was required to make sure that the SPD complied with ERISA.  It failed to do so by allowing a deficient SPD to be given to plan participants like Deborah Braunstein.

### b.  The Certificate Of Insurance Does Not Clearly And Simply Describe The Life Insurance Conversion Right

Even if the Certificate of Insurance is considered to be part of the SPD, it also violates ERISA.  In CIGNA, the United States Supreme Court explained "the basic summary plan description objective: clear, simple communication."  Id. at 1877.  An SPD must clearly and simply communicate the information required by statute and regulation to a plan participant.

---

[12]   The SPD paragraph quoted above is also complicated by the fact that it refers to a "Master Policy."  No explanation is provided about the difference between the Certificate of Insurance and the Master Policy.  The language of the SPD here is confusing and, as noted, does not clearly and simply apprise plan participants of their rights and obligations under the Plan.

Although the thirty-seven pages comprising the Certificate of Insurance describe the terms of the Plan, including the conversion right, the terms are not clear, simple, or "written in a manner calculated to be understood by the average plan participant."  Therefore, even if the Certificate of Insurance was part of the SPD, Weaver Bros. breached their fiduciary duty by providing an inadequate SPD.

In order to come to the conclusion asserted by Weaver Bros. that the Braunstein Beneficiaries are not entitled to benefits, a review of the language in the Certificate of Insurance is required.  The analysis begins on pages three and four, the "General Definitions" section, which defines approximately seventeen different terms that are used throughout the Certificate, which is over thirty pages long.  Next, after skipping to page nine, there is a section entitled "Eligibility and Termination Provisions for You."  This section describes "When Your Insurance Ends" by making reference to terms listed in the "General Definitions" section.  This section states that insurance ends on the date "you stop *active work*."  (J. Ex. 4 at 18.) (emphasis in original).  However, this is subject to an exception if a person stops "active work" due to a disability — the "Disability Benefit" — although this exception is not explained on page nine or cross-referenced.

The "Disability Benefit" section is explained on page fourteen and is subject to a limitation defined in the "Maximum Benefit Period" provision.  Both the "Disability Benefit" and the "Maximum Benefit Period" are explained using terms defined in the "General Definitions" section on pages three and four.  There is a different "Maximum Benefit Period," depending on whether a participant becomes disabled before or after their sixtieth birthday.

Once the "Maximum Benefit Period" ends, group life insurance benefits also end.  Under the "Conversion to an Individual Policy" provision, which is on page fifteen, this would allow a

participant to convert their group policy to an individual policy and continue to receive benefits. This right is not explained on page fourteen, and there is no cross-reference to page fifteen. The "Conversion to an Individual Policy" section is the key provision in this dispute.

This seeming explanation of rights, benefits, or even obligations of the plan participant is not clear or simple. The critical provision dealing with conversion rights requires a review of several steps over many pages. As previously noted, although an attorney or someone working with the Certificate on a frequent basis may be able to understand its convoluted terms, the average plan participant would not comprehend their rights, benefits, or obligations as written in the Certificate. For Deborah Braunstein, who was diagnosed with a cancer that disabled her and eventually caused her death, this conversion right was imperative for her to understand. Based on the record here, she would not have been able to do so.

For the foregoing reasons, this Court finds that Weaver Bros. breached its fiduciary duty to Deborah Braunstein by providing her with an inadequate SPD.[13]

---

[13]   In its Proposed Findings of Fact and Conclusions of Law, Weaver Bros. made two other arguments concerning the breach of fiduciary duty counterclaim as it relates to the SPD. (Doc. No. 133.) Neither argument is persuasive, but for the sake of completeness, the Court will address each one briefly here.

First, Weaver Bros. argues that state insurance law, not ERISA, determines the adequacy of an SPD. An SPD is a crucial component of an employee benefit plan. ERISA pre-empts "any and all State laws insofar as they . . . relate to any employee benefit plan." 29 U.S.C. § 1144. As such, all SPDs must comply with ERISA's requirements, regardless of state law.

Second, Weaver Bros. argues that the Braunstein Beneficiaries' breach of fiduciary duty claim based upon the inadequate SPD is time-barred. (Doc. No. 133 at 22.) ERISA bars actions for breach of fiduciary duty "after the earlier of (1) six years after. . . the date of the last action which constituted a part of the breach or violation . . . or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation. . . ." 29 U.S.C. § 1113. A breach of fiduciary duty claim does not accrue until the plaintiff obtains "actual knowledge" of the breach. Gluck v. Unisys Corp., 960 F.2d 1168, 1178 (3d Cir. 1992). "Actual knowledge of a breach or violation requires knowledge of all relevant facts at least sufficient to give the plaintiff knowledge that a fiduciary duty has been breached or

### 2. Weaver Bros., as a Fiduciary, Made Material Misrepresentations To Deborah Braunstein

Weaver Bros. also breached its fiduciary duty to Braunstein by engaging in misleading statements and actions that she relied upon to her detriment. These misrepresentations exacerbated Weaver Bros.' breach of its duty to provide her with an adequate SPD. Under ERISA, "[a]n employee may recover for a breach of fiduciary duty if he or she proves that an employer, acting as a fiduciary, made a material misrepresentation that would confuse a reasonable beneficiary about his or her benefits, and the beneficiary acted thereupon to his or her detriment." Adams v. Freedom Forge Corp., 204 F.3d 475, 492 (3d Cir. 2000). A misrepresentation is material if "there is a substantial likelihood that it would mislead a reasonable employee into making a decision to his or her detriment." Daniels v. Thomas & Betts Corp., 263 F. 3d 66, 71 (3d Cir. 2001) (quoting In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig., 57 F. 3d 1255, 1261 (3d Cir. 1995) (internal quotations omitted).

Colangelo admits that she told Braunstein when Braunstein began disability leave that the company considered her an active employee, and that she would therefore continue to receive benefits just like all other active employees. This admission is supported by the letter that Colangelo sent to Fortis after Deborah Braunstein's death, in which Colangelo wrote:

> In summary, Deborah was never terminated by us because **our position was that she remained an active employee** who would return to work at any time.

*     *     *

---

ERISA provision violated." Id. Here, there is no evidence that Deborah Braunstein was ever aware of the breach. Moreover, the earliest possible accrual date was the date in April 2011 when her beneficiaries' claim was first officially denied by Fortis. After the claim was rejected, the beneficiaries obtained actual knowledge that Weaver Bros.' failure to provide Braunstein with an adequate SPD caused injury. The beneficiaries filed their counterclaim on November 21, 2011, well within the three-year statute of limitations.

> **[W]e promised Deborah Braunstein that we would continue**
> **her benefits through our organization just like we do for all**
> **active employees.**  It was always Deborah Braunstein's desire to
> return to work as soon as she could.  It would have been
> insensitive, irresponsible and inappropriate to discontinue her
> benefits through our company.  Up until Deborah Braunstein's
> death, we continued to treat her as an employee and this included
> paying for her health and life insurance as well.

(J. Ex. 44.) (emphasis added).[14]

When Colangelo informed Braunstein that she would be treated as an "active employee"
and that her benefits would continue, Colangelo was making material misrepresentations to
Braunstein.  Colangelo never read the Certificate of Insurance or the SPD.  She was not aware of
the definition of "active work" in the Certificate, which includes "working full-time for the
policyholder . . . at your usual place of business."  (J. Ex. 4 at 12.)  Braunstein may not have met
these requirements and was misled into believing she was still an "active employee."  Moreover,
she was misinformed that her benefits would continue when, in fact, they could lapse if the
conversion right was not exercised.

Moreover, Colangelo faxed Braunstein a blank beneficiary designation form and
requested that she update her beneficiaries.  No mention was made of the conversion requirement
at this point.  When Braunstein requested that Colangelo "look [the forms] over to make sure
[she] included the necessary information," Colangelo did not inform her that her policy could
lapse on October 10, 2010.  (J. Ex. 30.)  Colangelo knew at this point that Braunstein had cancer
and that it was critical for Braunstein's paperwork to be correct.  She informed Braunstein that
"she had all other[] [paperwork]," when, in fact, Weaver Bros. now contends that this was not the
case.  (Id.)  Colangelo provided advice without having read the SPD or Certificate of Insurance.

---

[14]   Weaver Bros. has acknowledged this letter, but now argues that it was "mistaken in paying
the premiums for [Braunstein's] life insurance."  (Doc. No. 57 at 7.)

Consequently, Colangelo, acting as a fiduciary, made material misrepresentations and omissions that did more than simply "confuse" Braunstein, "a reasonable beneficiary," about her benefits, but rather completely misled her about them.  Adams, 204 F.3d 475, 492 (3d Cir. 2000).  The evidence establishes that had she been informed, Braunstein would have exercised her conversion right in order to ensure that her beneficiaries were paid upon her death.  Colangelo testified that she believed Braunstein wanted to maintain her policies when she went on disability leave.  No evidence has been submitted to the contrary.  (See C.T. at 62:5-7.)  However, because she relied on Colangelo's promise of coverage and because she was unaware of the conversion option, she did not convert her policy and her beneficiaries have not been paid.  Therefore, Braunstein relied upon Colangelo's material misrepresentations and omissions to her detriment.[15]

---

[15]  Although not raised by the Braunstein Beneficiaries, Colangelo's statements give rise to a claim of promissory estoppel.  An equitable remedy,

> [p]romissory estoppel allows the court to enforce a party's promise that is unsupported by consideration where (1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the promisee, (2) the promise does induce action or forbearance by the promisee, (3) and injustice can only be avoided by enforcing the promise.

Carlson v. Arnot-Ogden Mem'l Hosp., 918 F.2d 411, 416 (3d Cir. 1990) (citing Cardmone v. Univ. of Pittsburgh, 384 A.2d 1228, 1233 (Pa. Super. Ct. 1978)).

Colangelo promised Braunstein that Weaver Bros. would continue her benefits.  (J. Ex. 44.)  At the time she made this promise, Colangelo was aware of Braunstein's serious medical condition and her desire to maintain her benefits for her beneficiaries.  Therefore, Colangelo should have reasonably expected her promise to induce Braunstein's forbearance, which it did.  Injustice would be avoided by holding Weaver Bros. to their word.  As Colangelo explained in her letter to Fortis:

> [U]p until January 14, 2010, we promised Deborah that we would continue her benefits through our organization just like we do for all active employees.

\*   \*   \*

### a.  Weaver Bros. Was Under an Affirmative Duty to Disclose the Life Insurance Conversion Right

Similar to their argument regarding the SPD, Weaver Bros. contends that Colangelo was under no duty to inform Braunstein of her conversion right.  Weaver Bros. relies upon Jordan v. Federal Express Corp., 116 F.3d 1005 (3d Cir. 1997), in support of their argument by excerpting a line in the discussion where the Third Circuit stated: "We recognize that participants have a duty to inform themselves of the details provided in their plans . . . ."  Id. at 1016.  In relying on this limited quotation, Weaver Bros. overlooks the fact that the Jordan decision has similarities to this case, and actually holds that plan administrators, in certain circumstances, are under a fiduciary obligation to inform plan participants about material information that could affect their benefits.

In Jordan, an airline pilot on long-term sick leave received a letter from his employer advising him that after his sick leave was exhausted, he would be eligible for a disability benefit. Id. at 1007.  After applying for the disability benefit by filing the necessary paperwork, the pilot's employer advised him in a letter of his projected disability benefits under three annuity benefit plans from which he could choose.  Id.  The letter failed to mention that the plans prohibited post-retirement changes to the designation of a joint beneficiary, although he was free to make changes to his designation before retirement.  Id. at 1008.  After the pilot retired, he divorced his wife and remarried.  Id.  His employer refused to add his new wife as a joint beneficiary to his annuity plan because the beneficiary designations he had made became irrevocable after he retired.  Id.

---

> Deborah passed away on January 21, 2011, . . . well within the 31 day period for her to elect her conversion option to an individual policy.  On this basis, the proper course . . . to follow is to pay Deborah Braunstein's death claim.

(Id.)

The Third Circuit in <u>Jordan</u> noted that the pilot had prior experience with changing his retirement benefits.  <u>Id.</u> at 1017.  Although the plan administrator failed to inform him of the irrevocability of his beneficiary designation in the letter, because of his prior experience, an issue of fact existed as to whether the administrator's failure to notify him of the irrevocability of his benefits post-retirement constituted a breach of fiduciary duty, despite the pilot's failure to inquire about his rights and benefits.  <u>Id.</u>

The sentence from <u>Jordan</u> cited by Weaver Bros., when read in context, illustrates the Court's reasoning:

> We recognize that participants have a duty to inform themselves of the details provided in their plans, and that the irrevocability restriction was contained in Jordan's plans.  But it is uncontested that Jordan did not receive copies of the plans or their Summary Plan Descriptions before his election.  We also recognize that Jordan never requested information on irrevocability. . . .
>
> But in prior cases, we have held a specific request for information is not necessarily a prerequisite for finding a fiduciary breach to inform.  As we held in <u>Glaziers</u>, "it is clear that circumstances known to the fiduciary can give rise to this affirmative obligation [to inform] even absent a request by the beneficiary."  Moreover, in <u>Bixler</u> we held that "while the beneficiary may, at times, bear a burden of informing the fiduciary of her material circumstance, the fiduciary's obligations will not be excused merely because she failed to comprehend or ask about a technical aspect of the plan."  Here, we do not believe Jordan's failure to inquire is fatal to his claim.

<u>Id.</u> at 1016 (internal citations omitted).  Similar to the situation faced by Braunstein here, the pilot was unable to make an informed choice about his benefits because he did not have an adequately descriptive SPD.  In addition, like Weaver Bros., the pilot's employer was aware of a material circumstance that created an affirmative duty to inform.  Because Colangelo knew that Braunstein had cancer and that she sought Colangeo's assurance that her paperwork was sufficient, Colangelo had an affirmative duty to at least read the SPD and Certificate of Insurance

and give Braunstein proper advice on which she could rely.  Instead, as noted above, Colangelo misled Deborah Braunstein.

Under ERISA, "the duty to disclose material information 'is the core of a fiduciary's responsibility.'"  Bixler v. Cent. Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1993) (quoting Eddy, 919 F.2d at 750).  "[W]hen a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries."  In re Unisys Corp. Retiree Med. Ben. ERISA Litig., 57 F.3d 1255, 1264 (3d Cir. 1995).

In Unisys, the court noted: "Unisys affirmatively and systematically represented to its employees that once they retired, their medical benefits would continue for life — even though . . . the plans clearly permitted the company to terminate benefits."  Id. at 1264.  The Third Circuit held that this conduct "constitute[d] a breach of fiduciary duty in its most basic form."  Id.

In Estate of Gore v. Crozer Chester Med. Ctr., No. 96-8192, 1997 WL 570906 (E.D. Pa. Sept. 5, 1997), an employee at retirement age was diagnosed with large-cell lymphoma.  Id. at *1.  The defendant employer, who had knowledge of the employee's serious illness, remained silent about a provision in the employee's pension plan that precluded retirement benefits if the employee died prior to retirement.  Id. at *1-2.  The employee unwittingly elected to remain employed and collect long-term disability benefits.  Id. at *2.  As a result, she did not receive any of her pension benefits upon her death.  Id.  The employee's estate sued the employer.  Id.

The court held "that a genuine issue of material fact exists as to whether defendant knew of Ms. Gore['s] terminal illness and if so, whether its silence in the face of this knowledge constituted a breach of fiduciary duty."  (Id. at *4.)  The court further stated:

> Under Third Circuit precedent, a fiduciary is not only under a "negative duty not to misinform, but also [under] an affirmative duty to inform when the Trustee knows that silence might be harmful."  "[T]he fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance.  This is so even if that information comprises elements about which the beneficiary has not specifically inquired."

Id. at *5 (quoting Bixler, 12 F.3d at 1300 (internal citation omitted).  The employer in Gore argued that Bixler was distinguishable because the employee in Gore did not inquire about her benefits, unlike the employee in Bixler.  The court held:

> [I]n [Jordan v. Federal Express Corp.] the plaintiff plan participant did not make inquiry about his benefits either.  Nevertheless the Court found that an issue of fact existed as to whether the employer's failure to inform the plaintiff of the irrevocability of his retirement selection constituted a material omission and a breach of its fiduciary duty.

Id. at *5.

Jordan, Bixler, Unisys, and Gore illustrate that ERISA forbids a fiduciary from misleading or making material omissions to a plan participant or beneficiary.[16]  Here, Weaver Bros. breached its fiduciary duty to Braunstein by actively misleading her about Plan terms and by failing to inform Braunstein of her conversion rights when the company knew that Braunstein was severely ill.  Had she been informed, Braunstein would have exercised her conversion right in order to ensure that her beneficiaries were paid upon her death.  The only reason she did not

---

[16]   Although the procedural posture of Jordan, Bixler, Unisys, and Gore was at the summary judgment stage, in which the standard of review is different from the fact-finding function of a judge in a non-jury trial under Fed. R. Civ. P. 52, these cases still are instructive in deciding the ERISA claims at issue here.

exercise the right is because Weaver Bros., the Plan Administrator, led her to believe that her life insurance benefits were in full force and would continue because she was being treated as an active employee.

Still, Weaver Bros. argues that <u>Bicknell v. Lockheed Martin Benefits Plan</u>, 410 F. App'x 570 (3d Cir. 2011), forecloses the Braunstein Beneficiaries' claims.  In <u>Bicknell</u>, the plaintiff attempted to enroll his son in a life insurance plan online.  <u>Id.</u> at 573.  The online enrollment form did not require the plaintiff to enter his son's date of birth.  <u>Id.</u>  Shortly after the enrollment, the plaintiff's son died in a car accident.  <u>Id.</u>  When the plaintiff requested benefits under the life insurance plan, the request was denied because his son was too old for coverage.  <u>Id.</u>  Similar to the instant case, the plaintiff could have converted his son's policy to an individual policy and maintained coverage.  <u>Id.</u>  The plaintiff argued that the defendant failed to provide him with notice of the conversion option.  <u>Id.</u> at 575.

The Third Circuit held that "the plan documents themselves, which alerted Bicknell to the fact that he needed to apply to convert coverage within a limited period of time after his dependent became ineligible, were the only notice required by the statute."  <u>Id.</u> at 575.  "[T]hose plan documents make clear that <u>under no circumstances</u> can an employee convert dependent coverage to an individual plan more than ninety-one days after the dependent becomes ineligible as such."  <u>Id.</u> (emphasis in original).  Weaver Bros. argues that under the reasoning of <u>Bicknell</u>, Braunstein had a duty to inform herself of the conversion option, and Weaver Bros. was under no obligation to notify her of her rights.

<u>Bicknell</u> is distinguishable.  In <u>Bicknell</u>, the plaintiff alleged that employees of the defendant misled him by stating, "so long as he was able to enroll a dependent online, the dependent was eligible for coverage."  <u>Bicknell</u>, 410 F. App'x at 576 n.5.  Despite this

representation, the court in <u>Bicknell</u> found that the plaintiff was on notice of the terms of the plan because the online system clearly communicated the terms to the plaintiff, and any alleged statements by defendant's employees could not modify or supersede the terms.  <u>Id.</u>

The plaintiff in <u>Bicknell</u> attempted to enroll his son in a life insurance plan via an online system that conspicuously stated: "Claims will only be paid for dependents you have enrolled who meet the eligibility requirements for those plans.  You are responsible for maintaining accurate information on the eligible dependents you want to cover."  <u>Id.</u> at 573.  A similar clear, simple statement was not communicated to Braunstein in the instant case, where Weaver Bros. failed to provide her with notice of the conversion option in the SPD as required under ERISA, and communicated misleading information to her.  Here, Braunstein was not clearly alerted either by Weaver Bros. or the plan documents of the need to convert.

### b. Evidence of Intentional Deception Is Not Required to Establish a Breach of Fiduciary Duty Claim Based on a Plan Administrator's Material Misrepresentations

In addition, Weaver Bros. argues that because Colangelo did not intentionally deceive Braunstein when she made material misrepresentations to her about the plan, the company cannot be held liable under a breach of fiduciary duty theory.  The Third Circuit has rejected this argument.  In <u>Fischer v. Philadelphia Elec. Co.</u>, 994 F.2d 130 (3d Cir. 1993), the court held that a plan administrator was prohibited from making affirmative material misrepresentations to plan participants about changes to their benefit plans.  Plaintiffs in <u>Fischer</u> were a group of employees who retired shortly before their employer offered an early retirement plan or retirement "sweetener."  <u>Id.</u> at 132.  The employer had announced that it was considering such a plan, but when the potential retirees inquired about its availability, their benefits counselors told them that "no plan was being considered, or that they had no knowledge of any plan."  <u>Id.</u>   In defending

the breach of fiduciary claim, the employer argued that the oral communications could not have been affirmative misrepresentations because "when the benefits counselors . . . stated that they knew of no [early retirement] plan, their representations were correct." Id. at 135.  They were technically telling the truth, because management had never informed them that they were considering an early retirement plan.  Id.  The counselors had not inquired with management about the new plan, because the counselors assumed that if management wanted them to know about the plan, management would instruct them accordingly.  But in the Third Circuit:

> [t]his explanation will not do, for the fiduciary obligations owed to the plan participants [are] owed by [the employer] as plan administrator.  These obligations cannot be circumvented by building a 'Chinese wall' around those employees on whom plan participants reasonably rely for important information and guidance about retirement.
>
> *        *        *
>
> Put simply, when a plan administrator speaks, it must speak truthfully.

Id.  (internal citations omitted).

Similarly here, Weaver Bros. cannot eschew its duties under ERISA by burying its head in the sand.  Colangelo, as a Plan Administrator and Weaver Bros.' designated "point person" for employee benefits, had a duty to read the life insurance plans offered by Weaver Bros. and accurately represent the terms of those plans to participants.  Weaver Bros. cannot be relieved of liability simply because Colangelo's actions were not malicious.

### c.   A Writing Is Not Required To Establish a Breach of Fiduciary Duty Claim Based on a Plan Administrator's Material Misrepresentations

Finally, Weaver Bros. argues that "several circuits" have held that when an oral misrepresentation by a Plan Administrator contradicts the written terms of the plan, the plan participant must show written documentation of the administrator's misrepresentation in order to

establish a breach of fiduciary duty claim.  (Doc. No. 133 at 43) (citing Ladouceur v. Credit

Lyonnais, 584 F.3d 510, 513 (2d Cir. 2009) ("[A] party alleging a breach of fiduciary duty on the

basis of a statement purporting to alter the terms of an ERISA benefit plan must point to a

written document containing the alleged statement."); Frahm v. Equitable Life Assur. Soc. of

U.S., 137 F.3d 955, 961 (7th Cir. 1998) ("[A] person cannot rely on an oral statement, when he

has in hand written materials disclosing the truth.").

 First, while the Third Circuit has not specifically addressed this precise question, the

Third Circuit in Jordan, Bixler, Unisys, and Gore held that ERISA forbids a fiduciary from

misleading or making material omissions to a plan participant or beneficiary.  Third Circuit

precedent does not exclude oral misrepresentations from ERISA's reach.  Indeed, if this Court

were to adopt the reasoning of the Second and Seventh Circuits, it would be damming a "strong

current in the Third Circuit that recognizes that an ERISA fiduciary may not affirmatively

mislead plan participants."  Unisys, No. 969, 1994 WL 284079 (E.D. Pa. June 23, 1994) (citing

Bixler, 12 F. 3d 1292; Fischer, 994 F.2d 130).  Thus, the Court will not follow the rule set forth

in the Opinions of the Second and Seventh Circuits.

 However, even if the Court were to adopt the reasoning of the Second and Seventh

Circuit and require the Braunstein Beneficiaries to show a written record of Colangelo's

misrepresentations, the Braunstein Beneficiaries would still prevail.  First, Colangelo confirmed

her misrepresentations in her letter to Fortis.  In the letter, she admits telling Braunstein that

Weaver Bros. still considered her an "active employee," and that her life insurance benefits

would continue.

 Second, under ERISA, "when a plan administrator affirmatively misrepresents the terms

of a plan or fails to provide information when it knows that its failure to do so might cause harm,

the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries." Unisys, 57 F.3d at 1264.  Here, not only did Colangelo make oral misrepresentations to Deborah Braunstein, she also made oral and written misrepresentations to Jacqueline Braunstein, Deborah Braunstein's beneficiary.  In e-mail exchanges after her mother's passing, Jacqueline Braunstein discussed her mother's benefits with Colangelo, who helped her contact the appropriate insurance companies.  In their exchanges, the two discussed how the Braunstein Beneficiaries were entitled to the proceeds of the Fortis Life Insurance Plan, and on February 9, 2011 Colangelo told Jacqueline Braunstein that in order to process the claim she would "need two [forms] for [Fortis]."  (J. Ex. 35 at 1.)  These e-mail exchanges are written documentation that Colangelo affirmatively misled the Braunstein Beneficiaries about their benefits under the Plan.

Accordingly, given the above analysis, this Court finds that Weaver Bros. breached its fiduciary duty by communicating materially misleading information to, and withholding material information from, Deborah Braunstein, that she relied upon to her detriment.

### C.    Braunstein Beneficiaries May Seek "Appropriate Equitable Relief" Under 29 U.S.C. § 1132(a)(3)(B)

Weaver Bros. contends that the money damages sought by the Braunstein Beneficiaries are inappropriate because ERISA only provides for equitable relief.  In response, the Braunstein Beneficiaries argue that the U.S. Supreme Court held in CIGNA, 131 S. Ct. 1866 (2011), that the type of relief sought by the Braunstein Beneficiaries here is permissible under 29 U.S.C. § 1132(a)(3) because it is "appropriate equitable relief."  See, e.g., Templin v. Independence Blue Cross, 487 F. App'x 6, 12 n.9 (3d Cir. 2012).  The Court agrees that CIGNA permits the Braunstein Beneficiaries' claim for relief.

Section 1132(a)(3) is a "catchall" provision "act[ing] as a safety net, offering appropriate equitable relief for injuries caused by violations that [§ 1132] does not elsewhere adequately remedy." Varity Corp. v. Howe, 516 U.S. 489, 512 (1996).  Section 1132(a)(3) provides:

> (a) Persons empowered to bring a civil action
> A civil action may be brought —
>
> \*        \*        \*
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

ERISA is rooted in trust law principles.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110–11 (1989).  Under ERISA, plan fiduciaries are treated as trustees, and the terms of the plan are treated as a trust.  CIGNA, 131 S. Ct. at 1879.  "Only traditional equitable remedies" are available in awarding relief under § 1132(a)(3).  Leckley v. Stefano, 501 F.3d 212, 230 (3d Cir. 2007) (citing Mertens v. Hewitt Assocs., 508 U.S. 248, 256 (1993); Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209–10 (2002)).  However, § 1132(a)(3) also affords participants or beneficiaries the opportunity to seek monetary relief as an equitable remedy.

In CIGNA, the district court had awarded monetary compensation for the defendant's breach of fiduciary duty.  Petitioners challenged the award of monetary compensation as an unavailable form of relief under ERISA.  The Court held:

> Equity courts [traditionally] possessed the power to provide relief in the form of monetary "compensation" for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment.  Indeed, prior to the merger of law and equity this kind of monetary remedy against a trustee, sometimes called a "surcharge," was "exclusively equitable."
>
> The surcharge remedy extended to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that

41

> fiduciary.   Thus, insofar as an award of make-whole relief is
> concerned, the fact that the defendant in this case . . . is analogous
> to a trustee makes a critical difference.   In sum . . . the types of
> remedies the court entered here fall within the scope of the term
> "appropriate equitable relief" in [§ 1132(a)(3)].

CIGNA, 131 S. Ct. at 1880 (internal citations omitted).

Here, Weaver Bros. is a fiduciary, and is therefore treated like a trustee under ERISA.  As

discussed in CIGNA, this Court is empowered to award monetary compensation analogous to the

historical relief of "surcharge" to the Braunstein Beneficiaries for Weaver Bros.' breach of

fiduciary duty.  Weaver Bros. acknowledges CIGNA and argues that this case does not satisfy the

"requirements . . . from the law of equity," without any elaboration.  (Doc. No. 69 at 5) (citing

CIGNA, 131 S. Ct. at 1878).)  This argument is without merit.  Accordingly, Weaver Bros. as a

fiduciary can be held accountable for monetary damages as a "surcharge" under the provisions of

29 U.S.C. § 1132(a)(3)(B).

### D.    Braunstein Beneficiaries Are Entitled To Relief In Their Individual Capacities

Weaver Bros. also contends that the Braunstein Beneficiaries cannot seek individual

relief under 29 U.S.C. § 1132(a)(3), and that an action for breach of fiduciary duty may only be

brought on behalf of a plan.  Weaver Bros. relies, however, on a number of cases that discuss the

unavailability of individual relief under § 1132(a)(2).  (Doc. No. 50 at 34–35.)  As discussed

above, the Braunstein Beneficiaries are proceeding under § 1132(a)(3)(B), which provides that

"[a] civil action may be brought . . . by a beneficiary . . . to obtain other appropriate equitable

relief . . . ."  The cases cited by Weaver Bros. discussing the availability of relief under

§ 1132(a)(2) are inapposite to the present case.

In Varity, the United States Supreme Court held that "[t]he words of [§ 1132(a)(3)] —

'appropriate equitable relief' to 'redress' any 'act or practice which violates any provision of this

title' — are broad enough to cover individual relief for breach of a fiduciary obligation." <u>Varity</u>, 516 U.S. at 510. Furthermore, § 1104(a) "requires fiduciaries to discharge their duties 'solely in the interest of the participants and beneficiaries.' Given these objectives, it is hard to imagine why Congress would want to immunize breaches of fiduciary obligation that harm individuals by denying injured beneficiaries a remedy." <u>Varity</u>, 516 U.S. at 513; <u>see</u> <u>Bixler</u>, 12 F.3d at 1299–1300. Consequently, the Braunstein Beneficiaries are entitled to relief in their individual capacities.

## IV.   CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of Deborah Braunstein on her counterclaim for breach of fiduciary duties by Weaver Bros. in the amount of $120,000, plus interest from August 26, 2011, the date Weaver Bros. filed suit in this case and officially notified the Braunstein Beneficiaries that they were not liable under ERISA to compensate them.

District Courts "have broad discretion to award prejudgment interest." <u>Skretvedt v. E.I. DuPont De Nemours</u>, 372 F.3d 193, 205 (3d Cir. 2004). A "successful ERISA plaintiff [can] obtain prejudgment interest as part of his or her award of delayed ERISA benefits." <u>Id.</u> at 207. If the parties cannot agree on the amount of interest due, they are directed to file with the Court a notice on the amount of interest and the method of calculation. The Court will then make a final decision on the amount of interest payable.

An appropriate Order follows.